UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEGGY LEE GARDNER,

                        Plaintiff,           Case No. 11-cv-10689
                                                      Honorable Julian Abele Cook
                                                       Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 22]

Plaintiff Peggy Lee Gardner ("Gardner") brings this action pursuant to 42 U.S.C. §405(g), challenging the portion of a final decision of Defendant Commissioner of Social Security ("Commissioner"), which denied entirely her application for Disability Insurance Benefits ("DIB"), and which denied in part and granted in part her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), finding her disabled as of December 11, 2008, but not prior to that date. Both parties filed summary judgment motions [14, 22], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") determination of Gardner's disability onset date is the product of the ALJ's failure to properly apply Social Security Ruling 83-20, and is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment

[22] be DENIED, Gardner's Motion for Summary Judgment [14] be GRANTED, that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decisions adverse to Gardner's application for DIB and SSI be REVERSED, and that this case be REMANDED for an award of benefits consistent with this Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On January 16, 2007, Gardner filed applications for DIB and SSI benefits, alleging disability beginning on July 1, 2006.  (Tr. 124-28).  Her claims for DIB and SSI were denied initially on March 27, 2007.  (Tr. 77-85).  Thereafter, Gardner filed a timely request for an administrative hearing, which was held on July 8, 2009, before ALJ Roger W. Thomas.  (Tr. 32-72).  Gardner (represented by attorney James Harvey) testified at the hearing, as did vocational expert ("VE") Robert Brezinski.  (Tr. 38-72).  On July 22, 2009, the ALJ found that Gardner did not establish that she was disabled prior to December 31, 2006 (the date she was last insured for DIB).  (Tr. 19-31).  However, he did find that she was disabled beginning on December 11, 2008, and awarded her SSI benefits as of that date.  (Tr. 30).  On December 17, 2010, the Appeals Council denied review of the adverse portions of the ALJ's ruling.  (Tr. 1-3).  Gardner then filed for judicial review of the final decision on February 18, 2011 [1].

### B.   Background

#### 1.   Disability Reports

In a January 16, 2007 disability field office report, Gardner reported that her alleged onset date was July 1, 2006.  (Tr. 140).  The claims examiner noted that, during a face-to-face interview, Gardner had difficulty talking and answering questions.  (Tr. 142).  The claims examiner further noted that Gardner "presented with appropriate hygiene and make-up," but noted that she "became tearful during the interview when discussing her mental illness."  (*Id.*).

2

In an undated disability report, Gardner indicated that her ability to work is limited by bipolar disorder, depression, anxiety, and a thyroid cyst. (Tr. 145). When describing how these conditions limit her ability to work, Gardner stated:

> I can't leave my home because of anxiety. I have no motivation and I snap at others (am easily angered). I am tired all of the time. I have mood swings and it is hard for me to concentrate and remember things.

(*Id.*). Gardner reported that she has suffered from these conditions since she was in third grade, but that she became unable to work on July 1, 2006. (*Id.*). Prior to that, she had not worked since August 21, 2001, when she was a loan officer. (Tr. 145-46). Gardner completed ninth grade, but had no further schooling.[1] (Tr. 151). She reported being seen by several doctors and therapists regarding her medical conditions. (Tr. 147-50). She was taking Effexor (for depression, mood swings, and anxiety). (Tr. 151).

In a function report dated February 1, 2007, Gardner reported that she lives in a house with her family. (Tr. 157). She indicated that she spends most of her time each day caring for her children, sitting on the couch, sleeping, cleaning (when she is "up to it"), and going to appointments. (*Id.*). She is able to take care of her children and animals, although her husband helps her with this. (Tr. 158). She is no longer able to "function" or "be around people," and her conditions interfere with her sleep. (*Id.*). She is able to attend to her own personal care, although she needs reminders to take her medication. (Tr. 158-59). She prepares breakfast each day, but it is "simple stuff." (Tr. 159). Some days, she is able to do laundry, clean dishes, and sweep, but she needs help doing these things and they could take her all day to complete. (*Id.*). She only goes outside when she has an appointment, and she does not go out alone because it makes her "nervous, anxious, a little paranoid." (Tr. 160). She does not go shopping, and she

---

[1] At the hearing before the ALJ, Gardner testified that she dropped out of school after the seventh grade. (Tr. 41).

does not pay bills or handle a savings account (because she has "no money"). (*Id.*). She has no hobbies, but she is able to spend time talking with her family. (Tr. 161). The only place she goes on a regular basis is the doctor's office (once a week). (*Id.*). She has problems getting along with others because she sometimes gets "very angry." (Tr. 162).

When asked to identify functions impacted by her condition, Gardner checked talking, hearing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others, saying that her condition "just doesn't let [her] function right." (Tr. 162). She cannot pay attention for very long, but she says that she is able to follow written instructions "good enough" and does not have a problem getting along with authority figures. (Tr. 162-63). She does not handle stress or changes in routine well, and she has a fear of abandonment. (Tr. 163).

In an undated disability appeals report, Gardner reported that, beginning on approximately November 1, 2006, her conditions worsened. (Tr. 180). Specifically, she reported that she was suffering from severe depression, was having "a lot" of suicidal thoughts, was diagnosed with borderline personality disorder, and was suffering from worsening panic attacks. (*Id.*). She was continuing to receive mental health treatment at both Lifeways Provider Network and Recovery Technology, and had begun taking "DBT classes"[2] for her borderline personality disorder. (*Id.*). She was taking Cymbalta (for panic, anxiety, and severe depression), Tegretol (for racing thoughts), and Trazadone (for anxiety and panic). (Tr. 182). She reported that her conditions kept her home a lot, because the medications she was taking (and their side effects) made her "physically not able to move." (Tr. 183).

---

[2] DBT stands for Dialectical Behavior Therapy, an intensive therapy program. (Tr. 699).

2.      *Plaintiff's Testimony*

At the July 8, 2009 hearing before the ALJ, Gardner testified that she is married, but that her husband had been in jail since May of 2009. (Tr. 39). She had three children, ages 16, 7 and 5 at the time of the hearing, all of whom were in school. (Tr. 40). She is able to drive, but does so only to travel to and from medical appointments. (Tr. 41). She finished seventh grade, but has had no other education. (*Id.*). She left home at age 12 and was married at 14. (Tr. 42). She testified that she has used marijuana in the past, but not on a regular basis. (Tr. 43).

Gardner further testified that, on a typical day, she wakes up when her children wake up, goes to the bathroom, and then lies down on the couch and takes numerous medications (for depression, anxiety, to sleep, etc.). (Tr. 44, 46). She (or her 16-year-old) might help the younger children get breakfast, and then the children watch television while she lies on the couch. (Tr. 45). She does not like to leave the house at all because she is afraid of "people just out in the world." (Tr. 47-48).

Gardner testified that, in September 2006, she was hospitalized after she attempted suicide by overdosing on hundreds of sleeping pills. (Tr. 52-53). This happened on the heels of the death of the man she viewed as her father, as well as a violent physical attack against her by her husband. (*Id.*). Gardner testified that her husband, Trent, had attacked her "many, many times," but that this particular attack – coming right after the death of her "father" – caused her to want "to die and not be here no more." (Tr. 54).

Gardner testified that much of her depression and anxiety stems from an inability to stop reliving horrific abuse she has suffered at the hands of her husband. (Tr. 55-58). For example, she testified that, on one occasion, in January of 2006, her husband beat her so badly that she could not walk, then dragged her into the bathroom. (Tr. 55-56). In her words:

5

> . . . I could not move, I couldn't crawl.  I couldn't lift my head up, and he proceeds to duck tape my hands behind my back.  He duck tapes my ankles, and he duck taped, and he duck taped layer on layer on layer, and he uses a whole roll of duck tape.  Now it don't make no sense.  Then on top of it, then he gets this big old chain, a big chain like you would tow a car with type of chain, and he chained through the duck tape, and this is all back behind me like hog tied behind me, and he duck tapes and he chains it up, and he's telling me, he's calling me bad names and telling me not to move.  And I'm laying there, and I can't even talk.  My mind's just sitting there like I'm dying.

*          *          *

> This plays every day, and I have days where it plays all day long.  And I cry, and I don't understand.  And I have other days where it might not absorb the whole day, but it's always there.

(Tr. 56-57).  Gardner testified that she cannot stop thoughts of this abuse.  (Tr. 56-58).  When asked why she has been unable to work, since at least July of 2006, Gardner said: "I wouldn't be able to shut my thoughts off in my head, first of all.  I can't not [sic] shut my tears off no matter how much depression medication I take."  (Tr. 58).  In addition, she described an inability to concentrate and focus, as well as generalized feelings of worthlessness and paranoia.  (*Id.*).  She testified that she cries every day, sometimes for short periods of time, sometimes "all day long." (Tr. 61).  She does not sleep well because she cannot shut off her thoughts and is afraid of noises that she hears outside.  (Tr. 62).  The ALJ specifically noted that Gardner "was crying and appeared anxious and very troubled throughout the hearing."  (Tr. 28).

### 3.    *Medical Evidence*

The record contains a substantial amount of medical documentation regarding Gardner's anxiety, depression, and borderline personality disorder, as well as certain physical impairments.  Because Gardner does not take issue with the ALJ's evaluation of her physical impairments, the court will focus its attention on her mental impairments.

6

(a)      *Foote Hospital*

Gardner was hospitalized at Foote Hospital from September 1, 2006 through September 5, 2006, following a suicide attempt with Tylenol sleeping pills.  (Tr. 210-19).  On admission, Gardner reported that she had a "long history of being depressed" but had never sought help for it.  (Tr. 210).  She had a flat affect and a depressed mood, and was tearful during the physical examination.  (Tr. 211).  She was diagnosed with "major depression with suicide attempt," and it was noted that she would undergo inpatient counseling with medication while in Foote's Mental Health Unit.  (*Id.*).

During her inpatient psychiatric evaluation, Gardner acknowledged that "for years she has been feeling sad, not being able to enjoy things, feeling hopeless, helpless, and worthless. Her energy level and concentration has been poor."  (Tr. 213).  She described an "elaborate history of abuse by her husband."  (Tr. 214).  It was noted during the mental status examination that she was tearful throughout most of the interview, her mood was depressed, and her affect was flat to tearful.  (Tr. 215).  Her Axis I diagnosis was "major depressive disorder, severe and recurrent," and her Global Assessment of Functioning (GAF) score was 25.[3]  (*Id.*).

Gardner was discharged on September 5, 2006.  In the Discharge Summary, it was noted that Gardner was "strongly advised that she should pursue therapy and medications as she has presented with symptoms consistent with major depression."  (Tr. 218).  Her Axis I diagnosis remained "major depressive disorder," and her GAF score had improved to 55.  (Tr. 219).

Gardner was seen in the Foote Hospital emergency room on two other occasions: in May of 2007, when she presented with "symptoms of hyperventilation" and was diagnosed with a

---

[3]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

panic attack, and in May of 2008, when she injured her neck and low back jumping on a trampoline with her children the day before. (Tr. 424-25, 432).

*(b)     Lifeways Provider Network*

On September 19, 2006, Gardner was evaluated by Suzanne Kirk, a nurse practitioner at Lifeways, in follow-up to her discharge from Foote Hospital's Mental Health Unit. (Tr. 233-35). Kirk reported that Gardner "continues to feel down and depressed, irritable, having difficulty sleeping, tossing and turning." (Tr. 233). Gardner admitted having been depressed since the age of seven or eight. (*Id.*). Gardner's Axis I diagnosis was "Major Depression, severe, first episode," and she was advised to continue with medication and therapy. (Tr. 234-35).

On November 16, 2006, Gardner was seen by Dr. Cheryl Jack, a consulting psychiatrist. (Tr. 228-32). Dr. Jack noted that Gardner had been taking Lexapro, but was having side effects. (Tr. 228). She reported that she continued to have problems at home "with her husband drinking daily like a fish," and Dr. Jack observed that Gardner's judgment was questionable given "that her husband is still significantly abusing and is putting her and the family at risk." (Tr. 228, 231). Gardner's Axis I diagnoses were: major depressive disorder, adjustment disorder with mixed emotional features, partner relationship problems, meth abuse (in remission), and cannabis abuse. (Tr. 231). Her GAF score was 45-47, and she was prescribed Effexor. (*Id.*).

On December 7, 2006, Gardner again saw Dr. Jack for a medication review and evaluation. (Tr. 225-27). Gardner was "very upset and distraught" and reported that her husband had been very threatening, nasty, and non-supportive. (Tr. 225). She expressed hope that her husband would go back to jail so that there would be some peace in the house. (*Id.*). Dr. Jack noted that Gardner had a lot of self-esteem and self-worth issues that dated back to her childhood. (Tr. 226). Her mood was dysphoric, she was very tearful, and she did not feel that

8

the Effexor was helping.  (*Id.*).  Dr. Jack increased her Effexor dose and voiced concern regarding Gardner's "level of distraughtness." (Tr. 227).

Gardner next saw Dr. Jack on December 29, 2006 for a medication review and evaluation. (Tr. 224).  She again expressed concerns that the Effexor was not working, but Dr. Jack continued the current dose, noting that there was "no histrionic quality to her today as was with her last appointment." (*Id.*).

On April 27, 2007, Dr. Jack wrote a letter on Gardner's behalf, explaining that although Gardner suffered from "unrelenting depression," she "would like to regain her former level of functioning and return to the work force." (Tr. 699).  Dr. Jack indicated that Gardner had been "very compliant" with her outpatient treatment and was motivated to complete an intensive therapy program. (*Id.*).  However, she asked that Gardner's "request for temporary disability for an initial period of 6-12 months" be granted, at which point Gardner would be reevaluated to determine whether she was capable of working. (*Id.*).

### (c)    Recovery Technology

Gardner began individual therapy sessions at Recovery Technology on November 14, 2006, and continued through at least January of 2009.  During that period of time, Gardner's primary therapist was Chasidy Adams,[4] and it appears that, on average, Gardner saw Adams at least three or four times per month.  Having reviewed in detail all of Gardner's progress notes from her therapy appointments, it appears that Gardner's mental status from week to week (or month to month) can best be characterized as up and down, demonstrating neither consistent improvement, nor consistent decline.  Although the court will not discuss each individual treatment session, a brief discussion of representative appointments is set forth below.

---

[4] It appears that "Chasidy Adams" and "Chasidy Fogg" are the same person.  For ease of reference, the court will consistently refer to this person as "Chasidy Adams."

(1)   <u>2006</u>

At Gardner's first appointment, on November 14, 2006, she appeared to be "frightened of her abusive husband," "cried throughout the session," and was characterized by Adams as "low functioning due to depressive symptoms." (Tr. 283). Adams noted that she had obtained a release "to discuss [Gardner's] employment case [with DHS] as she does not appear to be stable at this point to complete requirements for Work First." (Tr. 284). The next week, on November 20, 2006, Gardner "did not appear to be as emotional and guarded," however. (Tr. 281). On December 1, 2006, Gardner was "tearful throughout the session" and refused to discuss her husband's physical abuse because she believed a camera was recording the session and that the abuse would be reported. (Tr. 278). She admitted she was self-medicating with marijuana. (*Id.*). Ten days later, on December 11, 2006, Gardner was more hopeful about her marriage and said that she had "had a few good days." (Tr. 273).

(2)   <u>2007</u>

On January 8, 2007, Gardner was "tearful" when discussing her hope that her marriage would improve. (Tr. 267). On March 30, 2007, she was "depressed and angry," "cried throughout the entire session," and expressed suicidal ideations. (Tr. 687). On April 3, 2007, Gardner was depressed, preoccupied, and tearful; Adams advised that Gardner "should wait to seek employment until she is more stable as her symptomology has worsened." (Tr. 685).

On April 4, 2007, Adams wrote a letter to DDS on behalf of Gardner, indicating that she suffered from depression and borderline personality disorder. (Tr. 696). According to Adams:

> Peggy currently has an unstable home environment and is adjusting to her recent move to Michigan. Peggy's husband has severe psychological issues which create tension in her marriage as well as concerns for her safety. Peggy has been given the appropriate resources to seek help, however, she has not done so at this point. Peggy has demonstrated some capability to perform tasks for her own daily functioning, but not on a

10

> sustained basis.
>
> Since beginning therapy, Peggy's symptomology has actually worsened. . . . Due to Peggy's depression, borderline symptomology, and unstable home environment, it is not believed that completing job search functions at this time would be in Peggy's best interest.

(Tr. 696-97).

On May 17, 2007, Gardner again expressed suicidal ideations, saying that she "thought about drowning herself in the bathtub or overdosing on pills."  (Tr. 661).  In June and early July of 2007, however, Gardner reported that things were "better" and "going well at home," spurring characterizations of her relationship with her husband as a "rollercoaster."  (Tr. 640, 647, 651, 654).  By July 20, 2007, Gardner again "appeared depressed" and had thoughts of harming herself.  (Tr. 633).  On October 16, 2007, however, Gardner appeared slightly better, although she disclosed that she had been fighting suicidal ideations for thirty years.  (Tr. 536).  On November 19, 2007, Gardner reported that she was not doing well and "that she wanted to just die."  (Tr. 526).  On November 30, 2007, Gardner was depressed – she was about to lose her insurance and feared that, without medication and therapy, she would not be able to function and would end up in the hospital again.  (Tr. 521).

(3)   2008

On January 14, 2008, Gardner told Adams that her husband was drinking again, had gotten fired from his job, and that she was afraid he was trying to poison her.  (Tr. 512).  On January 22, 2008, Adams indicated that Gardner "is still experiencing difficulties related to her depression and Borderline Personality symptomology" and rated her GAF score at 60.  (Tr. 574, 579).  In February of 2008, Gardner reported feeling "exhausted" and "more depressed."  (Tr. 503, 505).  On March 4, 2008, Gardner said that "things have gotten worse at home."  (Tr. 501).  That same day, Adams completed a "Medical Needs" form, indicating that Gardner could not

11

work in any job for at least one year.[5]  (Tr. 701).

On April 9, 2008, Gardner cancelled an appointment because she was "in crisis."  (Tr. 496).  She had "stopped taking her meds and she has started feeling like giving up on everything."  (*Id.*).  She had started using marijuana again as well.  (*Id.*).  On May 13, 2008, Gardner again expressed suicidal ideations, saying that she had "increased depression" and that she had not "been caring about herself lately."  (Tr. 490).  In a monthly progress note dated July 9, 2008, Adams noted that Gardner had been inconsistent in attending appointments because she was focusing on getting her husband into substance abuse treatment.  (Tr. 480).  By August 6, 2008, however, Gardner reported that "shifting the focus to positives has helped over the past week."  (Tr. 474).  She and her husband had taken the children to the park, and she had decided to stop smoking marijuana again.  (*Id.*).  On September 16, 2008, Gardner reported increased depression and felt like her medications were no longer working.  (Tr. 616).

On December 3, 2008, just one week before the ALJ deemed Gardner disabled, Gardner and Adams had a session with Gardner's husband and his therapist, during which they discussed their mutual hope for a healthier marriage.  (Tr. 609).  The next week, on December 11, 2008, a similar session was held, during which Gardner's husband became upset and left.  (Tr. 604).  Over the next couple of days, Gardner apparently threatened her husband, resulting in a "welfare check" being conducted by the police, who reported that Gardner denied having negative thoughts and that she planned to remain safe.  (Tr. 605-06).  On December 18, 2008, Gardner and her husband again met with their therapists to discuss the "recent chaos, Peggy's threats, and their safety."  (Tr. 602).  Gardner stated that she was "feeling better" and that she and her husband were working on their relationship.  (*Id.*).  In a Diagnostic Assessment Update dated

---

[5] Adams and another Recovery Technology therapist, Mitzi Diesing, submitted updated versions of this form on July 31, 2008 and January 15, 2009, indicating the same thing.  (Tr. 700, 703).

December 22, 2008, it was noted that there was "increased marital discord with constant arguing and threats" and "recent police involvement."  (Tr. 561).  However, Gardner had "not recently had suicidal threats."  (Tr. 565).  Her GAF score was 50.  (*Id.*).

(4)    2009

On January 14, 2009, Gardner met with Adams for a "crisis intervention appointment"; she had been fighting with her husband and was planning to pick up her oldest son from school and stay in a motel for the night.  (Tr. 598).  On January 23, 2009, Gardner and her husband again met with their therapists, and Gardner reported being upset at the thought of leaving her marriage.  (Tr. 594).

On February 6, 2009, Mitzi Diesing, a therapist at Recovery Technology, wrote a letter to the Social Security Administration on Gardner's behalf, saying:

> [Gardner] has been struggling with depression and the debilitating symptoms including isolation, poor motivation, tearfulness, feelings of hopelessness, difficulties with sleep and appetite, poor concentration, flat affect, loss of interest, fatigue, and an overall sense of poor self-worth. . . . Although she has continued in therapy and has made some progress, this has been a slow and difficult process and one that is expected to be long term. . . . Although she has been seeking therapy since 2006, she continues to have difficulties with poor mood and her other symptoms.  Ms. Gardner's work history has been little and sporadic, as she has dealt with these issues for all of her life.  Again these issues will not be immediately resolved and she is unable to work any type of job.

(Tr. 549).  On May 29, 2009, Dawn Del Rio, another therapist at Recovery Technology, submitted a similar letter in support of Gardner's application for social security benefits, detailing the therapy services Gardner was receiving, as well as the medications she was taking, and saying, in relevant part:

> It is this writer's firm opinion that Peggy is not capable of working in any capacity due to the chronic nature of her illness and potential risk to self. Peggy is diagnosed with borderline personality disorder and posttraumatic stress disorder. . . . Peggy has suffered with chronic suicidal ideation since the third grade, she has prepared for suicide at least 30 times and she has

13

had one psychiatric hospitalization after overdosing on sleeping pills. She reports she has been fearful of being locked up and has thus not revealed the intensity of her suicidal ideation or intent.

(Tr. 692).

### (d)   Dr. Kevin Witt

Gardner also saw her primary care physician, Dr. Kevin Witt, on numerous occasions between April 20, 2007 and January 26, 2009. (Tr. 347-408). Many of these visits were for common physical ailments (such as a cold or cough). On many occasions, however, Dr. Witt commented on Gardner's psychological symptoms, noting that she suffered from "continued anxiety," "continued depression," and "sleeping difficulty." (*See, e.g.,* Tr. 328, 338, 341, 345, 356, 363, 380, 385, 388, 394, 406, 407).

On May 25, 2007, Gardner saw Dr. Witt after having been treated in the emergency room at Foote Hospital for dehydration, vomiting, and panic attacks. (Tr. 402). According to Dr. Witt, "Continued anxiety, depression and sleeping difficulty are noted but we are adjusting medications to cover this." (*Id.*). On October 5, 2007, Dr. Witt noted that because Gardner's husband was not taking his medication, he was in a crisis home and had gone into a severe bipolar attack. (Tr. 384). Again, Dr. Witt noted Gardner's anxiety, depression, and sleeping difficulty, indicating that these conditions were being treated with medication. (*Id.*). Less than a month later, on October 30, 2007, Gardner saw Dr. Witt, "complaining of depression and anxiety along with recurrent headaches," and relating that her husband was undergoing in-patient alcohol rehabilitation treatment. (Tr. 344). Dr. Witt observed that "continued anxiety, depression and sleeping difficulty are noted due to family stressors." (*Id.*).

On January 16, 2008, Gardner presented, complaining of "tremendous stress and anxiety," reporting that her husband was drinking again, and requesting to be put back on Klonopin. (Tr. 336). Dr. Witt changed Gardner's medications in an effort "to control her

14

depression." (*Id.*).   On April 23, 2008, Dr. Witt added Klonopin to Gardner's medication regimen "to help with her agitation."  (Tr. 379).  On May 1, 2008, Dr. Witt increased Gardner's Cymbalta (prescribed for depression) to the maximum approved dosage.  (Tr. 376).  On June 26, 2008, Gardner again saw Dr. Witt with complaints of fatigue.  (Tr. 369).  He noted: "She is living with [her husband] and he is a severe alcoholic.  She is under a tremendous amount of stress." (*Id.*).  On July 11, 2008, Gardner saw Dr. Witt, who noted that Gardner's husband was back in alcohol rehab "for the eighth time," and he placed her on Xanax "because of the increased tension."  (Tr. 367).  At her next visit, on August 5, 2008, she complained of "much anxiety," stating that the Cymbalta was no longer helping and she "has no interest in anything anymore."  (Tr. 365).

On December 22, 2008 – Gardner's first visit to Dr. Witt after the date on which the ALJ deemed her disabled – she raised similar complaints.  According to Dr. Witt's Progress Notes:

> Patient presents wondering about psych meds.  She states that Seroquel is making her extremely moody to the point of confrontation.  We will discontinue Seroquel and have her see psychiatrist today.  She also states that she is having difficulty in sleeping and severe anxiety.  Restoril and Klonopin will be extended to her for these.
>
> *             *             *
>
> NEUROLOGICAL/PSYCHOLOGICAL:  Ongoing anxiety, depression and insomnia are noted, but are controlled with medication.  Patient is aware of person, place and time and is cooperative with therapy although she is somewhat agitated.  Patient was stable at the time of discharge.

(Tr. 351).  Gardner's medical records indicate that she saw Dr. Witt only three more times after this:  on December 29, 2008 for cough and cold symptoms (no mention of psychological issues); on January 9, 2009 for sinus congestion, headache, and low back pain (noting ongoing anxiety controlled with medication)[6]; and on January 26, 2009 for ear pain (noting only that Gardner was

---

[6] At this visit, Gardner reported that her psychiatrist "is doubling or tripling her Seroquel dosage

having a "debate" with her psychiatrist because she did not believe the Cymbalta was helping her).  (Tr. 347, 348, 350).

*(e)*      *Consultative Examination*

At the request of the DDS, Gardner underwent a consultative examination with Thomas Horner, Ph.D., on February 23, 2007.  (Tr. 288-94).  Dr. Horner began by saying:

> Ms. Gardner related with some pressure of verbal expression, though she was coherent and non-tangential.  She is disgruntled with her life, and always has been.  She is anxious and very tearful.  She is emotionally locked into a marriage that has been sadistically violent in the past, and which continues to be dominated by her husband's constant drinking, his paranoid diatribes, and his ominous allusions to violence.  (I saw her husband for DDS last week and he is indeed a quite unstable, paranoid and prone-to-violent-mayhem individual.)

(Tr. 289).  Gardner had a history of chronic depression, chronic disaffection, and chronic and patterned unstable and highly volatile relationships, and she demonstrated a "sizable majority of traits and dynamics of borderline personality disorder. . . ."  (*Id.*).  Dr. Horner observed that Gardner "has no friends currently" and is "too depressed" to engage in her prior hobbies (gardening and decorating).  (Tr. 290).  During the mental status examination, Dr. Horner noted that Gardner was "anxious, obviously depressed/demoralized," that she tried to be pleasant but was "very depressed and in despair," and that she was "suspicious of people."  (Tr. 291-92).  He noted that Gardner had thought about suicide since she was very young and that, three years earlier, she had first attempted to commit suicide by placing a plastic bag over her head (which her husband removed).  (Tr. 291).  Dr. Horner's Axis I diagnoses were: depression, chronic intermittent (major type); adjustment disorder; and cannabis abuse associated with mood management.  (Tr. 294).  Her Axis II disorder was Borderline Personality Disorder (exhibiting

---

and is having the Klonopin put on hold."  (Tr. 348).  Gardner expressed a belief that this would lead to "dark consequences," but Dr. Witt abided by the psychiatrist's request.  (*Id.*).

16

eight of the nine traits of this disorder).  (*Id.*).  Her GAF score was 45-50.  (*Id.*).  According to

Dr. Horner's prognosis, Gardner's was a "chronic condition and outlook."  (*Id.*).

*(f)     Residual Functional Capacity Assessment*

On March 22, 2007, Rom Kriauciunas, Ph.D., a state agency psychologist, reviewed

Gardner's records and completed a Mental Residual Functional Capacity Assessment.   Dr.

Kriauciunas noted that Gardner suffers from a Personality Disorder (as defined in Listing 12.08)

and Substance Abuse Disorder (as defined in Listing 12.09), as well as chronic and intermittent

depression and adjustment disorder, medically determinable impairments that do not precisely

satisfy the diagnostic criteria for Listing 12.04 (Affective Disorders).  (Tr. 313, 317, 318).

However, Dr. Kriauciunas further opined that Gardner had only mild limitations with respect to

her activities of daily living, moderate difficulties with respect to maintaining social functioning,

moderate difficulties with respect to maintaining concentration, persistence, or pace, and that she

had had only one or two episodes of decompensation.  (Tr. 320).  Dr. Kriauciunas concluded that

Gardner was capable of performing simple, unskilled work.  (Tr. 301).

*4.     Vocational Expert's Testimony*

Robert Brezinski testified as an independent vocational expert ("VE").  (Tr. 65-72).  In

his Vocational Analysis, the VE characterized Gardner's past relevant work as a loan officer as

skilled in nature, and at a sedentary level of exertion.  (Tr. 197).  The ALJ asked the VE to

imagine a claimant of Gardner's age, education, and work experience, who would be limited to

performing simple, unskilled tasks.  (Tr. 66).  The VE testified that the hypothetical individual

would not be capable of performing Gardner's past relevant work.  (*Id.*).  However, the VE

testified that the hypothetical individual would be capable of working in light or medium,

unskilled jobs, such as hand packager (30,000 jobs in Michigan), cleaner/maid (28,000 jobs in

Michigan), and assembly (12,000-13,000 jobs in Michigan).  (Tr. 66-67).

The ALJ then modified the hypothetical as follows:

> Now if I were to change these limitations based on more recent
> evidence and limit her rather than with no exertional limitations,
> add that she would be able to be at best only light work. . . . And
> posturally limiting her from the full range of light to no more
> than occasional bending and twisting of the trunk, no more than
> occasional postural motions like stooping and kneeling,
> crouching and crawling, balancing. . . . [S]he shouldn't do
> repetitive or constant, in other words, and kneeling as a part of a
> job task.  Shouldn't have over the shoulder tasks on more than
> an occasional basis, as well as shouldn't have more than brief
> superficial contact with others in performance of her tasks.  That
> she shouldn't have a high stress position, and by that I mean that
> she shouldn't have a job that has high production goals where
> she has to meet a constant pace set by someone else.

(Tr. 67-68).  In response, the VE testified that the hypothetical individual would be capable of

working in assembly (5,000 jobs in Michigan) and machine operator positions (2,000-3,000 jobs

in Michigan).  (Tr. 68).

The VE also testified that if an individual could only be attentive to work tasks for a

couple of hours before breaking down with a crying spell, or if she had to miss one day of work

per week, she would not be able to sustain competitive employment.  (Tr. 69-70).  The VE ended

by saying that if an individual presented at work the way Gardner had presented at the hearing

(i.e., "tearful, crying, and really not functional"), she could not sustain competitive employment.

(Tr. 64, 71).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in

18

death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

> ### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that, prior to December 11,

2008, Gardner was not disabled under the Act.  At Step One, the ALJ found that Gardner has not

engaged in substantial gainful activity since July 1, 2006, her alleged onset date.  (Tr. 22).  At

Step Two, the ALJ found that Gardner has the severe impairments of low back and shoulder pain (diagnosed as lumbar sprain/strain, lumbar somatic dysfunction, and shoulder bursitis), major depressive disorder, anxiety-related disorder, personality disorder, and marijuana abuse. (*Id.*). At Step Three, the ALJ found that none of Gardner's severe impairments meet or medically equal a listed impairment. (Tr. 23-24).

The ALJ then assessed Gardner's residual functional capacity ("RFC"), concluding that, prior to December 11, 2008, Gardner was capable of performing light work, as defined in 20 C.F.R. §404.1567(b) and §404.967(b), except as follows: she was limited to occasional bending, twisting, stooping, kneeling, crouching, crawling, and balancing, no repetitive or constant kneeling, and no over the shoulder tasks on more than an occasional basis; in addition, she was limited to simple, unskilled tasks with brief and superficial contact with others and no high production goals. (Tr. 24-25). Beginning on December 11, 2008, however, the ALJ determined that, as a result of Gardner's "worsening depression, anxiety, crying spells, and sleep difficulties," she was no longer able to sustain the concentration, persistence and pace required for competitive work. (Tr. 27-28).

At Step Four, the ALJ determined that, since the alleged onset date, Gardner has been unable to do her past relevant work as a loan officer, which was skilled in nature. (Tr. 28). At Step Five, the ALJ concluded, based in part on the VE's testimony, that, prior to December 11, 2008, Gardner was capable of performing a significant number of jobs that exist in the national economy; after December 11, 2008, however, this was not the case. (Tr. 29-30). As a result, the ALJ concluded that Gardner "was not disabled prior to December 11, 2008 but became disabled on that date and has continued to be disabled through the date of this decision." (Tr. 20).[7]

---

[7] The ALJ also noted his duty to determine whether Gardner's substance abuse was a

E.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499

---

contributing factor material to the determination of disability.  (Tr. 21, citing 20 CFR §§404.1535 and 416.935).  After reviewing the record evidence, the ALJ concluded that although there were periods of time when Gardner used marijuana fairly regularly, there were other times when she abstained from substance use.  (Tr. 30).  Consequently, he concluded that her substance abuse disorder was not a contributing factor material to the determination of disability.  (*Id.*).  Neither party has challenged this finding.

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

      **F.**     **Analysis**

         1.    *Determination of Onset Date after a Finding of Disability Has Been Made*

Given the ALJ's determination that Gardner was disabled, the court's analysis of the instant dispute is guided largely by Social Security Ruling 83-20 – "Onset of Disability."  SSR 83-20 provides in pertinent part:

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

SSR 83-20.

Moreover, "when a claimant suffers from a chronic and long-standing condition, medical findings and conditions subsequent to the onset of disability are probative of the

medical condition existing prior to that time." *Garland v. Shalala*, 1996 WL 99809, at * 9 (6th Cir. Mar. 5, 1996) (citing *Ellis v. Schweicker*, 739 F.2d 245, 247 (6th Cir. 1984)).   In determining the disability onset date, "it is improper to base [the] decision on one single piece of evidence and to disregard other pertinent evidence."   *Id.* (citing *Hephner v. Matthews*, 574 F.2d 359, 362 (6th Cir. 1978)).   Because of the substantive rights that might be impacted by the onset date determination, SSR 83-20 emphasizes that "it is essential that the onset date be correctly established and supported by the evidence…"   SSR 83-20. Against that backdrop, the court turns to Gardner's claimed errors with the ALJ's determination that she was disabled as of December 11, 2008, but not any time prior.

### 2.   *Gardner's Argument that the ALJ Misapplied the Listing of Impairments for Mental Disorders Lacks Merit*

Gardner first argues that when "the ALJ concluded that [Gardner] met *four out of nine* Listings of Impairments for Mental Disorders…[t]hat is where the ALJ's analysis should have stopped.  Once a Listing is met, a finding of disability is directed because that is how the Listings work."   (Doc. #14 at 18, citing Tr. 22) (emphasis in original).   This argument rests on a misunderstanding of the ALJ's findings, and lacks merit.

After discussing certain of Gardner's ailments, the ALJ stated:

> Based on the above, the undersigned concludes that the claimant meets the *diagnostic criteria* for an affective disorder under Section 12.04; an anxiety-related disorder under Section 12.06; personality disorder under Section 12.08; and a substance addiction disorder under Section 12.09 of the Listing of Impairments.

(Tr. 22) (emphasis added).   However, as the Commissioner cogently and persuasively argues, simply because the ALJ concluded that Gardner met the *diagnostic criteria* of the Listings does not mean that the Listings themselves were met.  (Doc. #22 at 11).

Listing 12.00A specifically provides that, "The evaluation of disability on the basis of

mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months."  20 CFR Part 404, Subpt. P, App. 1, §12.00A. That section further provides that a claimant must provide medical documentation establishing two separate sets of criteria:  the paragraph "A" criteria (a set of medical findings), and the paragraph "B" criteria (a set of impairment-related functional limitations).  *Id.*  There are additional functional criteria (the paragraph "C" criteria) which are assessed only if the paragraph B criteria are not met.  *Id.*  Thus, a claimant has a listed impairment if the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

In this case, the ALJ specifically found that Gardner met the diagnostic criteria (i.e., the paragraph A criteria) for Listings 12.04, 12.06, 12.08, and 12.09.  (Tr. 22).  Contrary to Gardner's argument, however, this is not the end of the analysis, because the ALJ specifically found that Gardner did not satisfy the paragraph B criteria for any of these listings.[8]  (Tr. 23-24). Because Gardner mistakenly believed that the ALJ's analysis should have ended after he found Gardner met the diagnostic criteria, she did not challenge the ALJ's actual consideration of the Paragraph B or C criteria.  Accordingly, Gardner has waived the right to challenge those particular issues.  *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) ("[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be

---

[8] The ALJ concluded: "There is no evidence of any of the 'C' criteria of Section 12.00 contained in this record."  (Tr. 23).  Gardner has not challenged this finding, and it is supported by substantial evidence.

deemed waived") (citations omitted).

>    3.    *The ALJ's Determination that Gardner was Disabled as of December 11,*
>          *2008, But Not Prior to that Time, Runs Afoul of SSR 83-20 and is Not*
>          *Supported by Substantial Evidence*

As noted in Subsection 1 above, SSR 83-20 provides that once a finding of disabled is made, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record."  "[T]he date alleged by the individual should be used if it is consistent with all the evidence available."  SSR 83-20.  Based on a review of the entire record, the court agrees with Gardner that the ALJ's decision with respect to her onset date was inconsistent with the medical evidence, and that he should have used the onset date alleged by Gardner because it was consistent with the medical evidence of record.  *Id.*

In his decision, the ALJ concluded that, beginning on December 11, 2008, as a result of Gardner's purported "worsening depression, anxiety, crying spells, and sleep difficulties, [she] was not able to sustain the concentration, persistence and pace required for work activity on a full-time competitive basis."  (Tr. 27-28).  Neither Gardner nor the Commissioner has challenged this finding, and it is supported by the substantial evidence discussed above.  Assuming, then, that the evidence presented to the ALJ established that Gardner was disabled at least as of December 11, 2008, the fundamental question is whether, under Ruling 83-20, the ALJ properly rejected Gardner's alleged onset date as the actual date on which her disability commenced.

In support of his conclusion that, as of December 11, 2008, Gardner could not sustain the concentration, persistence, and pace required for full-time work, the ALJ opined that, beginning on that date, "[Gardner's] allegations regarding her symptoms and limitations are generally credible."  (Tr. 28).  In addition, the ALJ relied on two pieces of medical evidence to support his conclusion that "the record clearly reflects a significant worsening in [Gardner's] symptoms and ability to function beginning in December 2008."  (*Id.*).  This evidence includes: (1) progress

25

notes from December 22, 2008, which found Gardner "agitated and referred to her severe anxiety, difficulty sleeping, and extreme moodiness to the point of confrontation"; and (2) the February 2009 opinion of Mitzi Diesing, who opined that Gardner was unable to work competitively in any job.  (Tr. 28, citing Tr. 351, 702).  A review of the record as a whole, however, demonstrates that the distinction drawn by the ALJ between Gardner's condition before and after December 11, 2008, is not supported by substantial evidence, and is actually inconsistent with the medical evidence.

### a.      Gardner's Credibility

In concluding that Gardner was disabled as of December 11, 2008, the ALJ specifically found that, beginning on that date, Gardner's allegations regarding her symptoms and limitations were "generally credible."  (Tr. 28).  The ALJ stated:

> . . . [Gardner] was crying and appeared anxious and very troubled throughout the hearing.  She described a very difficult childhood and testified that the prior beatings she received from her husband weigh heavily on her.  She testified that she is terrified of her husband due to his physical abuse of her.  She testified she is unable to work because she is unable to concentrate or shut these memories off, even with prescribed medication.

(*Id.*).  While the ALJ found Gardner's testimony regarding her mental condition prior to December 2008 less than credible on account of supposed "significant inconsistencies in the record as a whole," (Tr. 25), the ALJ does not identify these "significant inconsistencies," and the court cannot, based on its own review of the entire record, find that such material inconsistencies exist.

The ALJ points to certain "facts" which purportedly undercut Gardner's credibility regarding her alleged onset date, including her failure to attend some of her scheduled therapy appointments in 2007 and 2008, which the ALJ found to "suggest[] that her symptoms were not as severe as alleged."  (Tr. 26).  The record, however, shows that Gardner was attending therapy

26

appointments approximately three to four times per month during this period of time, and the fact

that she missed a handful of appointments over a relatively long period of time can hardly be

characterized as a dismal attendance record.   Moreover, Social Security Ruling 96-7p, which

does provide some basis for drawing an adverse inference against an individual who misses

therapy sessions, also provides that ALJs have an obligation to consider the individual's

explanation for failing to follow a treatment plan.   Specifically, that ruling provides:

> [An] individual's statements may be less credible if the level or frequency
> of treatment is inconsistent with the level of complaints, or if the medical
> reports or records show that the individual is not following the treatment
> as prescribed *and there are no good reasons for this failure.*   However, the
> adjudicator must not draw any inferences about an individual's symptoms
> and their functional effects from a failure to seek or pursue regular
> medical treatment *without first considering any explanations that the
> individual may provide, or other information in the case record,* that may
> explain infrequent or irregular medical visits or failure to seek medical
> treatment.

SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (emphasis added).   In addition, the Sixth

Circuit has suggested that an ALJ should proceed with caution in drawing such an adverse

inference where the plaintiff suffers from a mental impairment.   *See Blankenship v. Bowen*, 874

F.2d 1116, 1124 (6th Cir. 1989).

In this case, a review of the reasons *why* Gardner cancelled (and typically rescheduled)

her appointments demonstrates that it was not because she was doing well or feeling better – the

inference the ALJ seems to draw from the missed appointments – but because she was doing

poorly and/or had more pressing issues to address.   For example, Gardner cancelled on October

23, 2007 because her daughter was ill, and she rescheduled.   (Tr. 533).   On April 9, 2008, she

cancelled because she was "in crisis," more depressed, and felt like giving up on everything.   (Tr.

496).   There is no indication in the ALJ's decision that he considered any of the reasons why

Gardner missed the appointments at issue; rather, he simply used her less-than-perfect attendance

as a basis for discrediting her allegations of disability prior to December 11, 2008.  Although this type of attendance issue might, in some cases, constitute evidence (or even substantial evidence) that the claimant was not disabled, that is not the case here, where the medical records surrounding the times of her missed appointments show that Gardner was experiencing all the same mental difficulties then that she was experiencing at the time when she was found to be disabled.  (*See, e.g.,* Tr. 536 (noting on October 16, 2007 that she had been fighting suicidal ideations for thirty years), 526 (noting on November 19, 2007 that she was not doing well and "wanted to just die"), 490 (Gardner expressed suicidal ideations and "increased depression" on May 13, 2008)).

Similarly, the ALJ considered in his credibility determination the fact that Gardner was "consistently [] described as well groomed at her therapy sessions, which suggests that her depression is not so severe that she has neglected her personal appearance."  (Tr. 23).  Again, however, the fact that each of Gardner's therapy progress notes contains the same stock phrase ("well-groomed and dressed appropriately") does not necessarily suggest that her conditions were not "disabling" as that term is used in the Act.  Many of those same progress notes also refer her abnormal affect (depressed and tearful, flat, angry and emotional, flat and agitated, dysthymic with suicidal ideation, etc.).  (Tr. 526, 541, 626, 667, 668).  Far more important to the determination of Gardner's onset date than her appearing at pre-December 2008 appointments well-groomed, is the fact that she was found to experience the same "chronic" mental infirmities both before and after that point in time.[9]  (Tr. 289-294, 313, 317, 318, 692).  *See* SSR 83-20; *Garland*, 1996 WL 99809, at *9 ("when a claimant suffers from a chronic and long-standing condition, medical findings and conditions subsequent to the onset of disability are probative of

---

[9] *See* SSR 83-20 at 2 (noting that "the medical evidence serves as the primary element in the onset determination.").

the medical condition existing prior to that time…it is improper to base a decision on one single piece of evidence and to disregard other pertinent evidence.").

The ALJ also relied on three isolated events in 2007 and 2008 to discount Gardner's testimony.  (Tr. 27).  Specifically, the ALJ points to a Foote Hospital emergency room record from May of 2008 (when Gardner injured her neck and low back while jumping on a trampoline with her children); an emergency room record from May of 2007 (when Gardner presented with anxiety-related symptoms after spending part of the previous day kayaking with her husband); and a statement Gardner made in August of 2008 that she had taken her children to the park on one occasion.  (*Id.*).  The ALJ found the fact that Gardner engaged in these activities suggested that her depression prior to December of 2008 "was not as debilitating as alleged."  (*Id.*).  Again, while a person's engaging in certain conduct can certainly be inconsistent with her being physically[10] or mentally disabled at that time, here, a review of the entire record shows that the ALJ's conclusion is not supported by substantial evidence.

Gardner testified at the hearing that her depression is worse some days than others, and that all she tries to do each day is to function enough to be able to take care of herself and her children.  (Tr. 62).  There is evidence in the record that her primary care physician was *urging* her to take her children on outings when she could.  (Tr. 367).  Thus, the fact that Gardner jumped on a trampoline, for example, on <u>one</u> occasion between 2006 and 2009, does not suggest that she was not credible regarding the symptoms and limitations she endured on a daily basis prior to December 11, 2008, or that she was not disabled during that prior period.

Nor is the ALJ's credibility assessment consistent with the relevant medical records that

---

[10] It also seems that a claimant's engaging in this type of activity is far more relevant to her alleged physical, as opposed to mental, disabilities, and there has been no challenge regarding the ALJ's findings as to the former.

the court must consider.[11]   In addition to the above-described evidence from the pre-December 2008 period which belies the ALJ's credibility determination, the ALJ failed to mention the "Narrative Summary and Formulation" that accompanied Chasidy Adams' January 22, 2008 Adult Diagnostic Assessment Update.  (Tr. 568-79).  This document, which essentially was an overall assessment of Gardner's functioning over the course of 2007, gives a far more complete and relevant[12] picture of her condition during the time period in question than do a few isolated incidents of activity which, examined in isolation, might suggest a non-disabled person.  In that assessment, Adams said:

> Although Peggy made some gains in therapy and DBT skills training, she is still experiencing difficulties related to her depression and Borderline Personality symptomology.  Peggy either exhibits or reports the following symptomology congruent with depression: depressed mood most of the day, insomnia, fatigue or loss of energy, feelings of worthlessness, and diminished ability to think or concentrate.  Peggy reports it is difficult to get herself motivated to engage in activities.  Peggy still reports the following symptomology congruent with Borderline Personality: efforts to avoid abandonment, she continues to stay in an unstable and intense marriage, identity disturbance, impulsivity which can be self-damaging, she has had some suicidal ideation and a past suicide attempt, she experiences mood swings, she has chronic feelings of emptiness, difficulty controlling her anger.

(Tr. 579).  This assessment, which was based both on Adams' observations and Gardner's reports, is completely consistent with her post-December 2008 medical records, and provides support for Gardner's allegations of disability prior to that time.  *See* SSR 83-20; *Garland*, 1996

---

[11] *See Fleenor v. Secretary of Health and Human Servs.*, 983 F.2d 1066 (6th Cir. 1992) (in determining whether ALJ's finding is supported by substantial evidence, court "must examine the record as a whole and 'must take into account whatever in the record fairly detracts from its weight.'") (quoting *Tyra v. Secretary of Health and Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  *See also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (noting that an ALJ's "explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence" are not supported by substantial evidence.)

[12] *See supra*, fn. 9.

WL 99809, at *9.  It should not have been ignored by the ALJ in making his credibility determination.[13]

### b.      Dr. Witt's December 22, 2008 Progress Notes

The ALJ also relied on progress notes from Gardner's visit to her primary care physician, Dr. Witt, on December 22, 2008, in concluding that there was a "significant worsening in [Gardner's] symptoms and ability to function beginning in December 2008."  (Tr. 28).  According to the ALJ, these notes indicated that Gardner was "agitated and referred to her severe anxiety, difficulty sleeping, and extreme moodiness to the point of confrontation."  (*Id.*).

A review of the record, however, establishes that Gardner's condition was no worse on that date (or afterward) than it was before.  On December 2, 2008, Dr. Witt noted that Gardner "states that Seroquel[14] is making her extremely moody to the point of confrontation" and that "she is having difficulty in sleeping and severe anxiety."  (Tr. 351).  As part of his neurological/psychological examination, Dr. Witt stated: "Ongoing anxiety, depression and insomnia are noted, but are controlled with medication.  Patient is aware of person, place and time and is cooperative with therapy although she is somewhat agitated.  Patient was stable at the time of discharge."  (*Id.*).  These observations are not materially different than Dr. Witt's observations on prior visits, where her condition was found to be worsening (January 16, 2008: Gardner reported "tremendous stress and anxiety"; April 23, 2008: Dr. Witt added Klonopin to her medication regimen "to help with her agitation"; May 1, 2008: Dr. Witt increased her

---

[13] In addition, the record contains evidence of six GAF scores: 25 on September 1, 2006, 55 on September 6, 2006, 45-47 on November 16, 2006, 45-50 on February 23, 2007, 60 on January 22, 2008, and 50 on December 18, 2008.  (Tr. 215, 219, 231, 294, 565, 574).  These scores, all of which reflect serious limitations in functioning during the period at issue, are fairly consistent over a period of more than two years, further supporting a conclusion that there was no significant distinction in Gardner's condition before and after December 11, 2008.

[14] It appears, then, that it was the *medication* Gardner was taking, not the underlying condition itself, that was making Gardner "extremely moody to the point of confrontation."

31

depression medication to the maximum approved dosage).  (Tr. 336, 376, 379).  And, indeed, *many* of Dr. Witt's progress notes indicate that Gardner suffered from anxiety, depression, and difficulty sleeping.  (*See, e.g.,* Tr. 328, 338, 341, 345, 356, 363, 380, 385, 388, 394, 406, 407).

Importantly, some of the greatest indicators of Gardner's severe mental health problems are found in the pre-December 2008 records.  For instance, Gardner was hospitalized at Foote Hospital from September 1, 2006 through September 5, 2006, following a suicide attempt.  (Tr. 210-19).  On March 30, 2007, she was "depressed and angry," "cried throughout the entire [therapy] session, and expressed suicidal ideations.  (Tr. 687).  On April 4, 2007, Adams summarized Gardner's condition by saying that her depression and borderline symptomology had actually worsened.  (Tr. 696-97).  On November 30, 2007, Gardner was not doing well and expressed "that she wanted to just die."  (Tr. 526).  On May 13, 2008, Gardner again expressed suicidal ideations and reported increased depression.  (Tr. 490).  Whatever one makes of this pre-December 11, 2008 evidence, the salient point here is that it is conspicuously consistent with the post-December 11, 2008 evidence that the ALJ found supported a finding of disability.  Accordingly, the ALJ should have used Gardner's alleged onset date, which fell in the prior period.  SSR 83-20.

Finally, the court notes that Dr. Witt's post-December 11, 2008 medical records do not support a conclusion that Gardner's conditions got significantly worse around or after that point in time as the ALJ found was the case.  (Tr. 27-28).  At Gardner's visit with Dr. Witt on January 9, 2009, he noted that her ongoing anxiety was controlled with medication.[15]  (Tr. 348).  Other

---

[15] At this visit, Dr. Witt also noted that Gardner's "psychiatrist is doubling or tripling her Seroquel dosage and is having the Klonopin put on hold."  (Tr. 348).  There is a notation in Gardner's January 9, 2009 Monthly Progress Note, signed by Mitzi Diesing, that Gardner's psychiatrist had increased her Seroquel and that Diesing advised Gardner to discontinue the Klonopin.  (Tr. 601).  Gardner's medications had been increased, decreased, and changed

subsequent notes contain no remarkable notations regarding Gardner's mental status. (Tr. 594, 598). And, when she saw Dr. Witt on January 26, 2009 for ear pain, he noted only that she did not believe that the Cymbalta she had been taking for depression was helping. (Tr. 347). There was no other mention of Gardner's mental status on this visit, or after this date. In short, Dr. Witt's assessment of Gardner's mental status post-December 2008 was no different than his assessment of her prior to that date.

c.      *Mitzi Diesing's February 6, 2009 Letter*

Lastly, in determining Gardner's onset date, the ALJ gave "great weight" to the February 6, 2009 opinion of Mitzi Diesing, which stated that Gardner was unable to work competitively in any kind of job because of her mental health issues:

> [Gardner] has been struggling with depression and the debilitating symptoms including isolation, poor motivation, tearfulness, feelings of hopelessness, difficulties with sleep and appetite, poor concentration, flat affect, loss of interest, fatigue, and an overall sense of poor self-worth. . . . Although she has continued in therapy and has made some progress, this has been a slow and difficult process and one that is expected to be long term. . . . Although she has been seeking therapy since 2006, she continues to have difficulties with poor mood and her other symptoms. Ms. Gardner's work history has been little and sporadic, as she has dealt with these issues for all of her life. Again these issues will not be immediately resolved and she is unable to work any type of job.

(Tr. 549). The ALJ found Diesing's letter to be "consistent with the description of [Gardner] described in treatment notes after December 2008," and therefore gave it "great weight" in making his ultimate decision. (Tr. 28). Neither party challenges the ALJ's conclusion that Gardner was disabled at (or shortly before) the time of Diesing's letter.

However, the ALJ's reliance on Diesing's letter to support a December 2008 disability

---

numerous times following her September 2006 suicide attempt, however, and there is no indication that this alteration was anything other than the latest attempt to better control her "chronic" and long-standing condition. (Tr. 289-294, 313, 317, 318, 692).

onset date is misplaced for a few reasons.  First, far from suggesting that Gardner's mental health

problems had recently become a serious issue, Diesing's letter states that Gardner's "difficulties"

were "continuing" ones she had "dealt with … for all of her life."  (Tr. 549).  Thus, using the

letter as support for a December 2008 disability onset date was illogical and erroneous.  Second,

the Diesing letter is consistent with other medical records and opinions from the prior years.  For

instance, Diesing's opinion parallels that of Chasidy Adams, expressed in an April 4, 2007 letter

to DDS:

> Peggy either demonstrates or reports the following symptomology congruent with Major Depression: Depressed mood most of the day, markedly diminished interest of pleasure in all or most activities most of the day, insomnia, psychomotor agitation/retardation nearly every day, fatigue or loss of energy, feelings of worthlessness, diminished ability to think, and a recent suicide attempt.
>
> *    *      *
>
> Since beginning therapy, Peggy's symptomology has actually worsened. . . . Due to Peggy's depression, borderline symptomology, and unstable home environment, it is not believed that completing job search functions at this time would be in Peggy's best interest.

(Tr. 696-97).[16]  Likewise, Diesing's opinion is consistent with Dr. Jack's, as set forth in a letter

dated April 27, 2007, in which Dr. Jack explained that Gardner suffered from "unrelenting

depression" and asked that Gardner's "request for temporary disability for an initial period of 6-

12 months" be granted.[17]  (Tr. 699).   In sum, the Diesing letter is probative of Gardner's

---

[16] In addition, Adams completed "Medical Needs" forms on March 4, 2008, July 31, 2008, and January 15, 2009, all of which indicated her belief that Gardner could not work in any job for at least one year.  (Tr. 700, 701, 703).

[17] Because Dr. Jack only asked that Gardner's request for disability for 6-12 months be granted, the ALJ found her opinion "inconsistent with a finding of disability for twelve consecutive months."  (Tr. 26).  Dr. Jack's letter was not directed to the Social Security Administration, however, and there is no indication she was aware of that agency's 12-month standard. Moreover, as Gardner persuasively argues, this opinion was written in April 2007, some seven months after Gardner was hospitalized after attempting suicide, suggesting that Dr. Jack did in

condition during the earlier period in a way that supports, rather than belies, a finding of disability during that time. *See* SSR 83-20; *Garland*, 1996 WL 99809, at *9 ("when a claimant suffers from a chronic and long-standing condition, medical findings and conditions subsequent to the onset of disability are probative of the medical condition existing prior to that time.")

Thus, the ALJ's usage of Diesing's opinion and his rejection of virtually identical opinions of Adams and Jack (who, like Diesing, were Gardner's treaters), is not supported by substantial evidence. An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §416.927(c)(2). Here, the opinions of Adams and Jack were consistent with the remaining evidence in the record. Viewing all three opinions together, the evidence establishes that, over at least a nearly-two-year period – from April 4, 2007 through February 6, 2009 – the mental health professionals treating Gardner were in agreement that she was (and had been) incapable of performing competitive work. There simply was no significant difference in Gardner's condition before and after December 11, 2008, and the ALJ's conclusion to the contrary is not supported by substantial evidence.

In sum, the ALJ chose a disability onset that was "inconsistent with the medical evidence of record" and not supported by substantial evidence. SSR 83-20. Instead, the ALJ should have used Gardner's alleged onset date[18] because it was consistent with the medical evidence in the record. *Id.*

---

fact believe that Gardner would be disabled for at least twelve months.

[18] The court notes that in her motion for summary judgment, Gardner repeatedly refers to her onset date as September 1, 2006. (Doc. #14 at 2 (¶¶3-4), 8, 19, 32).

    **4.**  *Remand for an Award of Benefits is Appropriate*

With Gardner having already been adjudged "disabled," and this court having found that the ALJ should have used Gardner's alleged onset date of September 1, 2006, the court recommends remanding this case back to the ALJ for an award of benefits using that alleged onset date. *See Faucher v. Sec. of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (it is proper to immediately award benefits if all essential factual issues have been resolved and the record adequately establishes the plaintiff's entitlement to benefits).

## III. CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [22] be DENIED, Gardner's Motion for Summary Judgment [14] be GRANTED, the ALJ's decisions adverse to Gardner's applications for DIB and SSI be REVERSED, and this case be REMANDED for an award of benefits consistent with this Report and Recommendation.


Dated: August 17, 2012        s/David R. Grand
Ann Arbor, Michigan         DAVID R. GRAND
                  United States Magistrate Judge


## <ins>NOTICE</ins>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail

to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 17, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager